## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAULA D.,[1]
    *Plaintiff,*

    v.

MARTIN J. O'MALLEY,[2]
COMMISSSIONER OF SOCIAL
SECURITY,
    *Defendant.*

No. 3:23-cv-972 (VAB)

## RULING AND ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Paula D. has filed an administrative appeal under 42 U.S.C. §§ 405(g) and 1383(c)(3) against Martin J. O'Malley, the Commissioner of Social Security ("Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title XVI Supplemental Security Income ("SSI") under the Social Security Act. Mot. for J. on the Pleadings, ECF No. 22 (Feb. 2, 2024).

The Commissioner has moved to affirm the decision. Def.'s Mot. for an Order Affirming the Decision of the Comm'r, ECF No. 26 (Feb. 29, 2024).

For the reasons explained below, Paula D.'s motion is **GRANTED**, and the Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

---

[1] In opinions issued in cases filed under § 405(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Federal Rule of Civil Procedure 25(d), Martin O'Malley has been substituted for Kilolo Kijakazi as Defendant in this suit.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

   A.  **Factual Background[3]**

      i.    <u>Medical History</u>

Born on October 5, 1969, Paula D. had reached the age of 51 at the time of her application for SSI benefits. Mem. in Supp. of Mot. for J. on the Pleadings, ECF No. 22-1 at 2 (Feb. 2, 2024) ("Mem.").

         a.  *Medical Conditions and Diagnoses*

Paula D. has obesity, asthma, lumbar degenerative disc disease, coarctation of the aorta, fibromyalgia, bipolar disorder, anxiety disorder, and panic disorder. Social Security Transcripts, ECF No. 12 at 17 (Sept. 22, 2023) ("Tr.").

Obesity is generally considered present where an individual's body mass index ("BMI"), or the ratio of their weight to the square of their height (in kg/m$^2$), exceeds 30.0. *Id.* During the relevant period, Paula D.'s BMI fluctuated between 31.93 and 42.38, "show[ing] a consistent pattern of obesity over time." *Id.* at 18 (citing *id.* at 463, 449, 501, 1196, 1580, 1686, 1705).

 Paula D.'s medical notes consistently mention her history of asthma. *See, e.g.*, *id.* at 1192, 1277, 1393, 1578, 1656, 1714. For at least some portion of the relevant period, she had prescriptions both for an inhaler and a nebulizer to alleviate wheezing or shortness of breath. *See, e.g.*, *id.* at 1202, 1219–20, 1247, 1284, 1596, 1612, 1673.

Likewise, Paula D.'s fibromyalgia is noted throughout her medical records. *See, e.g.*, *id.* at 1633, 1644. She reportedly experiences widespread pain and many tender points as a result. *Id.* at 1644.

---

[3] This section generally summarizes Paula D's medical history and conditions but given the length of the record, it is not exhaustive. The factual background provided here focuses on the aspect of Paula D.'s medical history that underlies the parties' dispute, *i.e.*, her anxiety and other mental health conditions and their effects on her potential absenteeism and/or ability to maintain focus for prolonged periods of time.

Paula D.'s medical records also indicate that she suffers from lumbar degenerative disc disease, also referred to as lumbar spondylosis. *See, e.g.*, *id.* at 449–50. In December 2020, a medical review revealed multilevel degenerative changes of the lumbar spine with intervertebral disc space narrowing and endplate sclerosis. *Id.* at 842. In July 2021, degenerative changes of the thoracic spine were noted in an x-ray. *Id.* at 1381. As a result of this condition, Paula D. experiences chronic diffuse low back pain, which was exacerbated by a fourteen-foot fall in April 2019. *Id.* at 448. This pain is also triggered day-to-day by smaller falls or other incidents. *Id.* at 1239.

At an August 2020 cardiology evaluation, Paula D. was diagnosed with mild coarctation of the aorta, in other words, a fold in the aorta. *Id.* at 1631–32, 1688. In March 2022, this coarctation was found to be stable, although annual echocardiogram examinations were ordered, and the provider noted that the condition should be monitored for possible dilation. *Id.* at 1644, 1688.

Many medical records indicate that Paula D. has numerous allergies, including to albuterol; azithromycin; bactrim (sulfamethoxazole-trimethoprim); bee stings and bee pollen; ciprofloxacin; clindamycin; divalproex; honey; latex; nacrobid (nitrofurantoin monohyd/m-cryst); morphine; moxifloxacin; Mucinex cold (phenylephrine-guaifenesin); mustard; nubain (nalbuphine); peanut; penicillins; prednisone; shellfish containing products; tree nuts; bee sting kit; guaifenesin; lidocaine; and Zoloft (sertraline). *Id.* at 448, 533–34. Yet, one evaluation in the record stated that "extensive allergy testing" reflected that her only allergy was to dog dander, *see id.* at 537, although it noted that "she still feels she has" others, *id.* at 451.

Paula D. suffers from a number of serious mental health conditions, including bipolar disorder, chronic severe anxiety with significant somatization, depression, and panic disorder.

*See id.* at 440, 554, 1665, 1769. The record also indicates that Paula D. is predisposed to catastrophic thinking, experiences significant food sensitivities and fears, displays obsessive-compulsive symptoms, and experiences agoraphobia. *See, e.g.*, *id.* at 137, 1204, 1246. A clear theme of the medical records is that Paula D.'s allergies interact with her anxiety and catastrophic thinking. *See, e.g.*, *id.* at 476 ("She develops some idiosyncratic anxieties such as getting anxious about food allergies and then changing her diet to purely chicken. I suggested she work with her therapist to address some of her irrational Thinking."); *id.* at 546 ("Reports being in constant panic before and after she eats.").

#### b.  Medical Opinions and Assessments

There are four medical opinions in the record that are relevant to the parties' briefs. The Court notes the pertinent parts of each.

In April 2022, Dr. Louis Telesford, Paula D.'s primary care physician, filled out a physical health questionnaire. *Id.* at 1656. He indicated that Paula D. was diagnosed with lumbago, fibromyalgia, asthma, anxiety, bipolar disorder, and sciatica, and that she experienced panic attacks and back pain. *Id.* In addition to identifying numerous physical limitations, Dr. Telesford assessed that Paula D. would be "[i]ncapable of even 'low stress' jobs." *Id.* at 1657. He additionally found that she would be likely to be "off task" more than 25% of the day and that she would miss more than four days per month of work as a result of her impairments or treatment. *Id.* at 1658.

In May 2022, Dr. Gary Plotke, Paula D.'s treating psychiatrist, filled out a mental health questionnaire. *Id.* at 1665–67. He indicated that he had been treating her for approximately nine years and that she was diagnosed with bipolar II disorder, generalized anxiety disorder, and chronic pain with significant psychosocial dysfunction. *Id.* at 1665. In his estimation, if Paula D.

were to work in a competitive setting, more than 15% of the time she would be precluded from: working in proximity to others; responding appropriately to changes in a routine work setting; dealing with normal work stress; or completing a normal workday or workweek without interruptions from psychologically based symptoms. *Id.* at 1666. He additionally indicated that 10–15% of the time, she would be precluded from accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers; interacting appropriately with the general public; and working in isolation from others while maintaining concentration and persistence to task. *Id.* Like Dr. Telesford, Dr. Plotke estimated that she would be likely to be absent from work more than four days per week as a result of her impairments or treatment. *Id.*

In July 2021, Dr. Fitzpatrick[4], an agency consultant, found that Paula D. had a diagnosis of generalized anxiety disorder with significant somatization and OCD symptoms, as well as panic disorder with agoraphobia and a history of bipolar disorder. *Id.* at 137. Dr. Fitzpatrick found that her symptoms and functioning were improving with time but noted that she had residual symptoms over the time frame assessed, which imposed moderate limits on her ability to tolerate stress. *Id.* Dr. Fitzpatrick also found that Paula D. would be able to maintain attention for two hours at a time and persist at simple tasks over eight- and forty-hour periods with normal supervision. *Id.* at 140.

In November 2021, at the reconsideration stage, Dr. Stacy Fiore, another agency consultant, found that "[b]ased on totality of evidence, [Paula D.] has severe psych MDIs [or medically determinable impairments] that cause functional impairments." *Id.* at 147. Dr. Fiore also assessed that Paula D. would be able to maintain attention, concentration, persistence, and

---

[4] The record does not contain this agency consultant's first name.

pace for simple, routine tasks for two hours at a time over a normal workday and workweek with normal supervision. *Id.* at 150.

### c. *Medical Visits and Appointments*

Between February 17, 2020 and June 7, 2022, Paula D. received medical and/or mental health treatment and services in 203 distinct appointments or events, spread over 189 days. Mem. at 37. These appointments can be roughly categorized as follows.

On 94 days, or approximately once every nine days, Paula D. attended a mental health appointment, including sessions at the Intensive Outpatient Program, group therapy, and medication management sessions with Dr. Plotke. *Id.* at 37–38.

On 45 days, Paula D. received outpatient medical care and treatment, including physical therapy; appointments with rheumatologists, cardiologists, pulmonologists, and Yale Spine orthopedics; and appointments for various diagnostic imaging services. *Id.* at 38.

Paula D. visited the emergency room 44 times on 41 separate days. *Id.* Twenty-two of these visits occurred as a result of Paula D.'s anxiety, food sensitivities, or catastrophic thinking, as well as heightened anxiety triggered by physical symptoms. *Id.* Twenty of these visits resulted from Paula D.'s belief that she was having allergic or anaphylactic reactions to medications or other allergens. *Id.* at 39. Four of these visits were unrelated to her anxiety. *Id.* at 38.

Paula D. spent 20 days inpatient, hospitalized after admission from the emergency department. *Id.*

### ii.   Disability Application

On February 17, 2021, Paula D. filed an application for SSI, alleging disability beginning

on April 9, 2019.[5] Tr. at 14. Her application was denied initially on July 20, 2021, and upon

reconsideration on December 2, 2021. *Id.*

Paula D. requested a hearing and appeared before Administrative Law Judge Matthew

Kuperstein ("the ALJ") on June 15, 2022, by video. *Id.*

On August 16, 2022, the ALJ denied Paula D.'s claims. *Id.* at 34. At Step One, the ALJ

found that Paula D. had not engaged in substantial gainful activity since February 17, 2021. *Id.* at

17. At Step Two, the ALJ found that Paula D. had the following severe impairments: obesity,

asthma, lumbar degenerative disc disease, coarctation of the aorta, fibromyalgia, bipolar

disorder, anxiety disorder, and panic disorder. *Id.* At Step Three, the ALJ found that Paula D. did

not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 CFR 416.920(d), 416.925 and 416.926. *Id.* At

Step Four, the ALJ found that Paula D. had the residual functional capacity ("RFC") to perform

light work as defined in 20 CFR 416.967(b), with certain additional limitations.[6] *Id.* at 21–32. At

Step Five, the ALJ found that Paula D. had no past relevant work, but that, considering her age,

education, work experience, and RFC, there were jobs that she could perform, which existed in

the national economy in significant numbers. *Id.* at 32. As a result, all together, the ALJ

---

[5] Under SSA policy, the ALJ only considered evidence from within one year of the filing date of Paula D.'s application, despite her alleged onset date of April 9, 2019. Accordingly, only evidence after February 17, 2020 was considered. *See* Tr. at 14–15.
[6] The ALJ wrote: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can only lift or carry twenty pounds occasionally and ten pounds frequently, stand or walk, with normal breaks, for a total of six hours in an eight-hour workday and sit, with normal breaks, for a total of six hours in an eight-hour workday. She can only frequently climb ramps or stairs, kneel, crouch or crawl and occasionally stoop. She must never climb ladders, ropes or scaffolds. She needs to be able to avoid concentrated exposure to extreme heat, extreme cold, or hazards such as moving mechanical parts or high exposed places. She must have no exposure to atmospheric conditions such as fumes, odors, dusts, gases or poor ventilation as defined in the selected characteristics of the Dictionary of Occupational Titles (DOT). She can only perform work involving simple, routine tasks for two hours at a time, over a normal workday and workweek that does not involve carrying out detailed tasks or instructions in a stable and predictable work environment that has only simple changes that occur at no more than an occasional frequency." Tr. at 21.

concluded that Paula D. was not disabled under Section 1614(a)(3)(A) of the SSA. *Id.* at 34.

Following an unsuccessful appeal to the Appeals Council, which was denied on June 1, 2023, *see id.* at 5, Paula D. appealed to this Court, *see* ECF No. 1 (July 24, 2023).

### B.  Procedural History

On February 2, 2024, Paula D. filed a motion for judgment on the pleadings, seeking to reverse the decision of the Commissioner denying her claim for SSI benefits. Mot. for J. on the Pleadings, ECF No. 22.

On February 29, 2024, the Commissioner filed a motion to affirm the decision of the Commissioner. Mot. to Affirm the Decision of the Comm'r, ECF No. 26 ("Opp'n").

On March 14, 2024, Paula D. filed a response to the Commissioner's motion. Response to Def.'s Mem., ECF No. 26 ("Reply").

## II.    STANDARD OF REVIEW

### Social Security Appeals

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the [Social Security Administration or] SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is generally "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (*per curiam*)).

When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, No. 3:16-CV-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only committed harmless error, such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.    DISCUSSION

### A.  Eligibility for SSI Benefits

In order to be entitled to benefits under the Social Security Act, a plaintiff must demonstrate that they have a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This determination is made

through a five-step evaluation.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b).

If they are not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.*

If the claimant has a medically determinable severe impairment, the ALJ proceeds to Step Three to determine whether any identified severe impairments meet or medically equal those identified in Appendix 1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.*

If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1).

At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden

is on the claimant to prove that he is disabled within the meaning of the Act . . . . However, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.").

### B. The Decision of the ALJ

Paula D. argues that the ALJ's decision is flawed in three ways. First, she argues that the ALJ's decision was not based on substantial evidence, and that the ALJ erred by improperly excluding the opinions of her treating physicians, Drs. Plotke and Telesford. Mem. at 44–48. Second, she argues that the ALJ failed to consider her likely absenteeism, a result of her chronic severe anxiety, when assessing her mental RFC. *Id.* at 37–48. Third, Paula D. argues that the ALJ failed to inquire into conflicts between the testimony of the vocational expert ("VE") and the DOT, in violation of SSR 00-4p. *Id.* at 49–50.

The Court addresses these arguments in turn.

#### 1. The Opinion Evidence

The regulations regarding the evaluation of various medical opinions were amended for claims filed after March 27, 2017, and the "Treating Physician Rule"[7] no longer applies. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867–68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. Paula D.'s application, which was filed on February 17, 2021, is subject to the new regulations. Tr. at 17.

Under the new regulations, "the Commissioner 'will not defer or give any specific

---

[7] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

evidentiary weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources.'" *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021) (quoting 20 C.F.R. § 404.1520c(a)). Instead, in considering various medical opinions, the Commissioner is required to consider factors including "(1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that 'tend to support or contradict a medical opinion or prior administrative medical finding.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(c), 416.920c(c)).

Although the ALJ is no longer required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* (alterations in original) (citation and internal quotation marks omitted). The ALJ is not required to specifically discuss each of the factors, but they must expressly consider "the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[S]upportability . . . and consistency . . . are the most important factors . . . [and] [t]herefore, [the ALJ] will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination."); *see also Vellone ex rel. Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion."), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). For the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the

more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(1),

416.920c(c)(1). For the consistency analysis, "[t]he more consistent a medical opinion(s) . . . is

with the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

Paula D. argues that the ALJ improperly discounted the medical opinions of two of her

doctors—Dr. Telesford, her primary care physician, and Dr. Plotke, her treating psychiatrist—as

to her ability to maintain focus at work and to work a normal schedule (eight-hour workday and

forty-hour workweek). Tr. at 44–48.

In response, the Commissioner argues that the ALJ offered a thorough discussion of the

medical opinions he ultimately deemed unpersuasive and clearly explained his reasoning. Opp'n

at 10–11. He further argues that Paula D.'s argument is essentially an invitation for the Court to

reevaluate the evidence, an inappropriate path, given the deferential standard of review. *Id.*

Ultimately, he emphasizes that there was substantial evidence supporting the ALJ's

determination. *Id.*

The Court disagrees.

Both Dr. Telesford and Dr. Plotke assessed, in relevant part, that Paula D. would be

absent from work more than four days per month as a result of her impairments or treatment. Tr.

at 1658, 1667. Additionally, both providers found that she would be off-task twenty-five percent

or more of the workday, *id.* at 1659, 1667, while Dr. Plotke additionally found that, fifteen

percent of the time, she would be precluded from completing a normal workday and workweek

without interruptions from psychologically based symptoms, *id.* at 1666.

The ALJ concluded that Dr. Telesford's opinion was "of little persuasiveness" because it

was "neither internally supported by his medical examinations with the claimant nor other

medical examinations" and because "Dr. Telesford did not formally treat the claimant's psychiatric issues[.]" *Id.* at 29. The ALJ further indicated that "[t]he other evidence of record documents that the claimant did not require regular inpatient hospitalizations to address her physical or mental impairments." *Id.*

The ALJ similarly found Dr. Plotke's opinion "of little persuasiveness." *Id.* at 31. Although he acknowledged that Dr. Plotke had treated Paula D.'s bipolar disorder, generalized anxiety disorder, and chronic pain for many years, he stated that Dr. Plotke's assessment was not supported by his own treatment notes nor the evidence he relied upon to formulate his own opinion. *Id.* The ALJ emphasized that, like Dr. Telesford, Dr. Plotke had not recommended higher levels of care for Paula D. since 2020. *Id.* He also noted that Paula D.'s condition seemed to have improved between July 2020 and July 2021. *Id.* He therefore concluded that there was "no persuasive evidence to support that [Paula D.] is precluded from performing mental work-related activities more than ten percent of the time along with being regularly off-task and absent from work." *Id.*

First, to the extent that the ALJ felt that these medical opinions were inconsistent with Dr. Telesford's and Dr. Plotke's own treatment notes, he had an obligation to investigate that inconsistency. *See Daniela B. v. Kijakazi*, No. 1:22-CV-03495-NRM, 2023 WL 3719634, at *7 (E.D.N.Y. May 30, 2023) (explaining that an ALJ has an "affirmative duty to recontact a medical expert if an ALJ makes an initial determination that a medical expert's opinions are vague or appear to be inconsistent with their examination notes"); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history[.]").

Second, upon closer examination, the ALJ's assessment of an alleged inconsistency

between the opinions and the medical records does not appear to be based on substantial evidence. In fact, all of the factors laid out in 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) support crediting Dr. Telesford's and Dr. Plotke's assessments.

As to supportability, there is significant evidence in the record suggesting that, during the relevant period, Paula D. regularly attended medical appointments and treatments that could reasonably be expected to affect her attendance at work. During that time period, Paula D. attended medical appointments, on average, every 4.5 days. *See* Mem. at 37 (Paula D. attended medical appointments on 189 separate days over the span of 842 days). The record also indicates that she experienced severe panic attacks, bouts of agoraphobia, manic and depressive episodes, as well as other mental health symptoms that could reasonably cause her to be absent or off-task. Even accounting for Paula D.'s improvement with treatment and assuming that some appointments could potentially be scheduled outside of business hours, both Drs. Plotke's and Telesford's assessments that Paula D. was likely to be absent from work at least four times per month are not inconsistent with the record.

As noted by the ALJ, there are some indications in the record that Paula D.'s anxiety and other mental health conditions had improved with treatment by mid-2021 and into 2022. *See, e.g.*, Tr. at 1281 ("I'm doing a little better"), 1201 ("She notes that since our last visit she is slightly less worried/focused on the obsession of having a catastrophic allergic reaction to foods that she knows she is not allergic to. She has been able to increase her food choices more so than previously. She also feels overall slightly less anxious. She still feels nervous much of the time but is less intense."), and 1775 (indicating that Dr. Plotke planned to discuss a "slow taper" with Paula D. to gradually help her to manage her anxiety with less reliance on benzodiazepines).

Over this same time period, the record indicates that Paula D.'s ability to engage in

productive social interactions with her fiancé and family members improved. *See id.* at 31; Mem. at 47–48. The record also shows that Paula D.'s visits to the emergency room were inconsistent over time, with several periods of lower frequency. Mem. at 46–47 (describing this uneven trajectory and emphasizing several periods of frequent visits, *e.g.*, June 2020 (six visits) and January 2021 (three visits), as well as periods in which Paula D. did not visit the emergency room at all).

But the medical records do not indicate a uniform improvement in Paula D.'s condition, nor do they show that her limitations related to absenteeism or ability to focus had changed. The notes from this period of her improvement also repeatedly state that Paula D. continued to experience high levels of anxiety, to struggle with phobias surrounding food intake, to experience episodic panic attacks, and to be somewhat agoraphobic. Tr. at 1769–70. Although her condition was, by some metrics, improving, there are no notes or other records that would support the ALJ's assertion that, based on this improvement, Paula D. would no longer be regularly off-task or absent from work.

Importantly, Dr. Plotke's assessment in May 2022 explicitly noted Paula D.'s improvement but emphasized that she still struggled with chronic anxiety and experienced significant limitations. *See id.* at 1665–67 (noting that Paula D. "[h]as benefited from treatment yet still struggles with chronic anxiety" and would be expected to miss more than four days of work per month and to be off-task twenty-five percent of the time or more). This assessment was supported by his own treatment notes.

As to the other factors, *see* 20 C.F.R. §§ 404.1520c(c), 416.920c(c), the assessments of Dr. Telesford and Dr. Plotke were entirely consistent with each other and, as described above, with the evidence in the record. Both doctors had a lengthy and significant treating relationship

16

with Paula D., especially Dr. Plotke, who, at the time of his assessment, had been treating her for nine years. Tr. at 1664. Finally, both doctors had relevant expertise. Dr. Plotke is a psychiatrist, a specialization highly relevant to the assessment of Paula D.'s mental health and her ability to stay on-task and sustain focus. Dr. Telesford, as Paula D.'s primary care physician, was well-positioned to weigh in on her absenteeism, as he was presumably aware of all of her various medical conditions and ongoing appointments.

As to agency consultants, Dr. Fitzpatrick and Dr. Fiore, they both found that Paula D. would be able to maintain attention for two hours at a time and that she could sustain a normal eight-hour workday and forty-hour workweek. *Id.* at 140, 150. The ALJ determined that "[t]hose portions of their opinions are supported by the evidence they relied upon to formulate their assessments[,]" including the medical record and the evidence produced at the hearing. *Id.* at 30.

But neither assessment explained the basis for the doctor's conclusion that Paula D. could maintain attention for two hours at a time, over a normal workday and workweek. And, the citations provided by the ALJ, *see id.*, refer to various parts of the medical record indicating that Paula D.'s symptoms, as they related to her mental health, were generally improving. Not one of those citations corresponded to evidence of Paula D.'s ability to sustain focus over long periods of time,[8] nor do they describe the hours or schedule she would be capable of maintaining at a competitive job.

---

[8] Several of the citations correspond to notes indicating that Paula D. participated actively in group therapy sessions. Such sessions, however, lasted only an hour and therefore cannot be probative of her ability to focus or work for longer periods of time. Moreover, there is no medical basis, at least in this record, for the inference that her ability to focus at work can be drawn from her ability to participate in and receive mental health services. *See, e.g.*, *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion'" (quoting *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))).

Accordingly, even if the agency consultant opinions had been supported by record evidence, to the extent that they differed from those of Paula D.'s own doctors regarding her likely absenteeism and ability to focus, the ALJ should have elicited more evidence, in order to resolve the inconsistencies and make a supported decision, and he erred in not doing so. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982))); *Rosa*, 168 F.3d at 79 (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in [the medical record], the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly[.]")).

### 2.   The Residual Functional Capacity Determination

Paula D. also argues that the ALJ erred by failing to consider her likely absenteeism, resulting from her frequent medical appointments, when assessing her RFC. Mem. at 41. In her view, the ALJ's failure to list a functional limitation regarding her ability to sustain full-time attendance at work was error, as the record demonstrates that she would not be able to sustain such attendance. *Id.* at 43.

The Commissioner responds that Paula D.'s argument regarding absenteeism is based on a simple tally of medical treatment visits and overlooks the credited medical opinions stating that she could maintain a normal work week. Opp'n at 4. He emphasizes that the ALJ directly considered the issue of absenteeism and concluded that a related restriction was unnecessary. *Id.* The record reflects, in the Commissioner's view, that the Plaintiff's anxiety improved over time and that many of the medical appointments reflected by the record were "not actually medically

necessary." *Id.* at 7–8. Moreover, he emphasizes that medical appointments need not necessarily correspond to an absence from work, arguing that such appointments could be scheduled outside of work hours, on weekends, or during breaks. *Id.* at 7. The Commissioner emphasizes that the RFC is a legal determination, for which the ALJ is responsible, and that this Court must defer to the ALJ's evaluation of the medical evidence. *Id.* at 4, 8.

Paula D. replies that medical visits have, in many cases, been found to be equivalent to absences from work. Reply at 2. She notes that such appointments generally require tardiness or absence for part of the workday, both of which, vocational experts regularly testify, may render an individual unemployable. *Id.* at 2–3. In any event, Paula D. emphasizes that "the effect of absenteeism, tardiness, and/or early departure from work on the ability of a claimant to engage in substantial gainful activity, is in the province of vocational experts" and not the ALJ. *Id.* at 4. Paula D. also notes that scheduling appointments for non-working days or hours is not always possible, where an individual is "not participating in concierge medical services." *Id.* at 5. She submits that she generally has little control over the scheduling of her appointments, in particular, her group therapy sessions. *Id.* at 5.

Paula D. also disputes the Commissioner's argument that numerous medical opinions in the record stated that she could maintain a normal work week; instead, she argues that the only two opinions that supported such a finding were produced by the Agency's medical consultants. *Id.* Finally, Paula D. disputes the ALJ's conclusion that her visits to the emergency room were "not medically necessary." *Id.*

Such a conclusion is, in her view, "a medical determination in the province of the physicians" and not supported by the record. *Id.* Paula D. instead argues that the emergency department visits were the result of her "chronic severe anxiety, panic attacks, depression,

irrational fears of food and medi[c]ation, and distorted perceptions of physical sensations[.]" *Id.* at 6. In other words, although she presented to the emergency department with physical symptoms, such visits were a symptom of her mental health conditions. *Id.*

The Court agrees.

The RFC assessment is an administrative determination for which the ALJ bears "the final responsibility." 20 C.F.R. § 404.1527(d)(2). When making an RFC determination, the ALJ's function is to weigh the evidence as a whole and resolve any conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). An ALJ need not necessarily engage in a function-by-function analysis in order to fully assess a claimant's RFC. *Cichocki v. Astrue*, 729 F.3d 172, 173–74 (2d Cir. 2013) ("[T]he failure explicitly to engage in such a function-by-function analysis does not constitute *per se* error requiring remand."). Instead, the relevant inquiry is whether the ALJ applied the correct legal standards and whether the determination is supported by substantial evidence. *Id.* at 177.

"As part of assessing all evidence informing a claimant's RFC, the ALJ must consider absenteeism where applicable[.]" *Renee S. v. Comm'r of Soc. Sec.*, No. 20-CV-1546S, 2022 WL 2841916, at *5 (W.D.N.Y. July 21, 2022). "Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." *Id.* (quoting *Griffin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017)). This is because "excessive impairment-related absenteeism may render an unskilled worker unemployable." *See Arnold v. Comm'r of Soc. Sec.*, No. 17-CV-987S, 2019 WL 2521179, at *6 (W.D.N.Y. June 19, 2019) (collecting cases).

As described above, the ALJ's determination of Paula D.'s mental RFC was based, at least in part, on his incomplete—and therefore, erroneous—assessment of the various medical opinions from Drs. Telesford, Plotke, Fitzpatrick, and Fiore.

As a result, the mental RFC determination must be adjusted to clarify the medical evidence about the impact of Paula's absenteeism on her ability to work, reconciling the differences in the current record between the findings of Drs. Telesford and Plotke and the opinions of Drs. Fitzpatrick and Fiore.

Indeed, several of the arguments regarding Paula D.'s likely absenteeism lack sufficient support from this record. For example, there is the argument that Paula D.'s medical appointments generally would not correspond to absences from work. Opp'n at 7–8. This argument assumes that these appointments could be scheduled outside of work hours, on weekends, or on holidays. But the record lacks any evidence as to whether Paula D's current medical providers, or any medical providers necessary for her various ailments, are open outside of typical business hours, let alone on weekends or holiday. The record similarly lacks evidence as to whether some of Paula D.'s regular appointments, such as her group therapy sessions, could occur outside of normal weekday business hours. Many of Paula D.'s medical appointments are visits to the emergency room—by definition, not scheduled in advance.

Furthermore, the characterization of many of Paula D.'s medical appointments as "not actually medically necessary," *id.* at 8, a medical determination not supported by the record. *See, e.g.*, *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical

21

opinion'" (quoting *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))); *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings."). The significant majority of Paula D.'s medical appointments during the relevant period were outpatient visits with her primary care physician, psychiatrist, group therapist, physical therapist, and other specialists participating in her ongoing medical treatment. Mem. at 37–39 (explaining that she attended mental health treatment and other medical appointments 139 times during the relevant time period).

Paula D.'s forty-four emergency room visits during this time period also cannot be categorized as medically unnecessary. In her treatment and progress notes, Paula D.'s doctors frequently discussed her visits to the emergency room as an indicator of her mental health and noted that, although such visits often resulted in no diagnosis for her physical symptoms, the compulsion to seek urgent medical care was a result of her "chronic anxiety with significant somatization," panic attacks, and catastrophic thinking. *See, e.g.*, Tr. at 450–51 ("She continues to have much somatic related anxiety though has had only 3 emergency room visits over the past 4 months."); 497 ("Overall she seems to be doing reasonably well and her chronic anxiety has definitely improved with the treatment at the IOP. More able to manage her anxiety states without catastrophic thinking etc[.]"); 1201 ("She is not having any episodes of panic anxiety/visits to the ER for allergic reactions/anxiety."); and 1213 ("Her chronic anxiety is somewhat improved though still struggles with bursts of anxious irrational somatic worries and will often interpret new physical sx catastrophically; her compulsive handwashing and obsessive worries about food allergies show early response to clomipramine").

Given that these visits to the emergency room were a symptom of Paula D.'s mental

health conditions, the ALJ had to consider their effect on her ability to attend work regularly, as part of his RFC determination. *See, e.g.*, *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) (emphasizing that the combined effect of each of a claimant's impairments on their RFC must be considered, regardless of whether every impairment is severe).

Accordingly, the ALJ's mental RFC determination, which failed to account for Paula D.'s likely absenteeism resulting from her physical and mental health conditions, was not supported by substantial evidence, an error that could not have been harmless. Mem. at 42 (citing Tr. at 111) (testimony of the vocational expert that, for the jobs identified at Step 5, only one absence per month would be tolerated by employers, and any absenteeism in excess of that amount would preclude employment).[9]

## IV.    CONCLUSION

For the reasons explained above, Paula D.'s motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at New Haven, Connecticut, this 23rd day of July, 2024.

                         */s/ Victor A. Bolden*
                         Victor A. Bolden
                         United States District Judge

---

[9] Paula D. has raised another argument regarding the ALJ's failure to investigate an alleged conflict between the testimony of the vocational expert and the Dictionary of Occupational Titles ("DOT"), under SSR 00-4p. Mem. at 49–51. The Court need not and will not reach that issue, as the ALJ's incomplete mental RFC assessment alone necessitates a remand of this case for further consideration. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) ("[T]he ALJ determined Parker-Grose's RFC without accounting for any of the limitations arising from her mental impairment that were established by substantial evidence in the record. Thus, the ALJ committed legal error.").